**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISON**

| | | |
|---|---|---|
| **MARTIN BARNARD** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE** |
| | ) | **NO:** |
| **v.** | ) | |
| | ) | |
| **ALAN M. KOZARSKY** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

## JURISDICTION AND VENUE

1. This Court, pursuant to 28 U.S.C. § 1332, has diversity jurisdiction over this matter because complete diversity exists between Plaintiff and Defendant Alan M. Kozarsky and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The Court has personal jurisdiction over the Defendant because he resides in this judicial district.

2. Venue is proper in this judicial district because Defendant resides in this judicial district and all of Defendant's tortious conduct giving rise to Plaintiff's claims occurred in this judicial district.

3. Defendant may elect to waive the unnecessary costs of service of the summons and Complaint, in accordance with Rule 4 of the Federal Rules of Civil Procedure. If Defendant refuses to waive service of the Summons and Complaint, Plaintiff will take steps to effect formal service in a manner authorized by the Federal Rules of Civil Procedure and will seek Defendant's payment of the associated costs of any such service.

## PARTIES

4.  Plaintiff Martin Barnard is and, at all material times, has been a citizen of the State of Ohio and is not a citizen of the State of Georgia.

5.  Defendant Dr. Alan Kozarsky is a citizen of the State of Georgia who operates a medical and consulting practice at 3193 Howell Mill Road, Suite 115, Atlanta GA, 30327.

The Nature of Defendant Kozarsky's Medical Practice

6.  Defendant Kozarsky is a licensed medical doctor in the state of Georgia with a subspecialty in Opthamology.

7.  Defendant Kozarsky is certified as an Aviation Medical Examiner (AME).

8.  Defendant Kozarsky is also certified as an AME who can perform duties associated with the Federal Aviation Administration (FAA)-approved Human Intervention Motivational Study (HIMS) program.

9.  As a HIMS AME, Defendant Kozarsky was required to be a professionally qualified physician.

10. At all relevant times, Defendant Kozarsky maintained his own private medical practice.

11. As a HIMS AME, Defendant Kozarsky was free to examine as few or as many pilot patients as he desired.

12. As a HIMS AME, Dr. Kozarsky worked without supervision.

13. As a HIMS AME, Dr. Kozarsky was required to develop special skills and training.

14. As a HIMS AME, Dr. Kozarsky was responsible for being informed as to the progress of aviation medicine and related drug/alcohol testing protocols.

15. As a HIMS AME, Dr. Kozarsky was required to use acceptable equipment and adequate facilities in carrying out his examinations.

16. As a HIMS AME, Dr. Kozarsky was required to maintain familiarity with general medical knowledge applicable to aviation in order to properly discharge his duties.

17. As a HIMS AME, Dr. Kozarsky was required to have detailed knowledge and understanding of FAA and the United States Department of Transportation (DOT) rules, regulations, policies and procedures related to the medical certification of airmen.

18. As a HIMS AME, Dr. Kozarsky was responsible for determining what tests should be administered to a pilot and to competently interpret any test results.

19. As a HIMS AME, Dr. Kozarsky was required exercise professional judgment in making determinations with respect to the evaluation of pilot health issues and to consult with experts, as required, to make his determinations.

20. As a HIMS AME, Dr. Kozarsky supplied his own instruments, tools and place of work for the performance of his duties.

21. As a HIMS AME, Dr. Kozarsky set his own fee and was paid directly by pilots who used his services.

22. Dr. Kozarsky had no employment relationship with the FAA or any other federal agency with respect to the performance of his HIMS AME services.

23. In the performance of his HIMS AME services, Dr. Kozarsky did not work on behalf of the FAA or any other federal agency.

*Plaintiff's written demand*

24. Plaintiff sent Defendant a written demand for payment of his damages more than thirty days before filing suit against Defendant per Ga. Code Ann. § 51-12-14.

## **FACTUAL BACKGROUND**

25. Plaintiff Barnard has been employed by Delta Air Lines, Inc. (hereinafter "Delta") as a commercial airline pilot since September 15, 2015. Plaintiff is also in the active service of the United States Air Force (USAF) in the rank of Lieutenant Colonel.

26. In December 2020, Plaintiff was subject to a Driving Under the Influence (DUI) charge after an automobile accident.  Plaintiff notified Delta of the incident.

27. On January 15, 2021, Plaintiff was admitted to Talbot Recovery, in Atlanta, Georgia, where he successfully completed all requirements for his inpatient/intensive treatment before being discharged home on February 24, 2021.

28. Upon discharge, Plaintiff entered into an outpatient substance misuse/dependency therapy group through Recovery and Prevention Resource (RPR) in Delaware, Ohio.  Plaintiff completed the recommended recovery program at RPR in June of 2021.

29. In August of 2021, Plaintiff transferred services for aftercare to Columbus Behavioral Health's Aviation Aftercare, in Columbus, Georgia.

30. On February 24, 2021, Plaintiff entered into an agreement with Delta, referred to as Contract A, that provided for his return to duties as a line pilot contingent on his compliance with aftercare requirements, including the abstinence from any mood altering drugs, including alcohol.

31. Contract A required that Plaintiff contract with Defendant Kozarsky to be his Medical Sponsor.

32. Plaintiff contracted with Defendant Kozarsky to provide a wide range of services, including monitoring and evaluating his recovery, determining and authorizing appropriate medication,

and determining the extent of further treatment, including psychiatric/psychological consultations.

33. Defendant Kozarsky oversaw Plaintiff's continuing recovery process, which included his active participation in professional counseling, peer support groups, and testing designed to confirm Plaintiff's abstinence from alcohol consumption. While under the care of Dr. Kozarsky, Plaintiff, at all times, maintained compliance with his aftercare groups and maintained attendance with Alcoholics Anonymous (AA).

34. Plaintiff treated with Defendant Kozarsky from February, 2021 through October, 2022, during which time Plaintiff had approximately eight consultations with the Defendant.

35. Defendant Kozarsky engaged in a continuing evaluation of Plaintiff's physical and mental health status and billed the Plaintiff for his medical services.

36. Defendant Kozarsky directly invoiced Plaintiff for the services he performed as his Medical Sponsor.

37. Plaintiff paid Defendant Kozarsky for all invoices that were submitted to him for Dr. Kozarsky's services.

38. With respect to the performance of his services as Plaintiff's Medical Sponsor, Dr. Kozarsky had no contract with any person or entity other than the Plaintiff.

39. With respect to the performance of his services as Plaintiff's Medical Sponsor, Dr. Kozarsky received no payment other than from the Plaintiff.

40. By contracting with the Plaintiff to provide the above-referenced services as Plaintiff's medical sponsor and engaging in an ongoing series of consensual transactions, Defendant entered into a physician-patient relationship with the Plaintiff.

41. At no time did Defendant advise the Plaintiff that the Plaintiff was not his patient.

42. On September 22, 2021, the Federal Aviation Administration (FAA) granted Plaintiff a Special Issuance of a first class airman medical certificate under 14 CFR § 67.401, based on the agency's determination, after a review of his clinical status, that he was medically qualified to return to flying status with Delta.

43. From August 31, 2021, through October 3, 2022, Plaintiff submitted to nineteen (19) biomarker chemical tests, a minimum of one per month, for the purpose of confirming his total abstention from alcohol use.

44. As Plaintiff's doctor and Medical Sponsor, Defendant Kozarsky accepted the responsibility of receiving and interpreting the results of Plaintiff's biomarker tests.

45. Defendant Kozarsky has no degrees or certifications in the field of medical toxicology.

46. Defendant Kozarsky has never been trained or certified as a Medical Review Officer in a manner consistent with the standards of the United States Department of Transportation under 49 CFR Part 40.

47. Dr. Kozarsky is not knowledgeable about issues relating to adulterated and substituted specimens.

48. Dr. Kozarsky has not received training in the interpretation of specimen validity test results prior to his October 14 report referenced below.

49. At all relevant times, Defendant Kozarsky lacked the necessary professional competency to interpret the Plaintiff's biomarker chemical test results.

50. Defendant Kozarsky never sought guidance from a competent expert with respect to the interpretation of the Plaintiff's biomarker chemical test results.

51. Of the nineteen (19) biomarker chemical tests to which Plaintiff submitted from August 31, 2021, through October 3, 2022, fourteen (14) of the tests applied the chemical methodology of ethyl glucuronide (EtG) to a urine matrix.

52. The EtG methodology measures ethyl-glucuronide molecules that may be produced either by an individual's consumption of, or exposure to, alcohol.

53. EtG at significant levels may be produced by an individual's use of hand sanitizer or mouthwash, or his consumption of a long list of common items, including pralines, non-alcoholic beer, pharmaceutical products, fruit juice, sauerkraut, or soy sauce.  Laboratories, therefore, generally use a "minimum threshold" of 250 ng/mL to indicate the intentional consumption of alcohol.

54. Nevertheless, historically, Delta has instructed its contracted laboratory to apply a cutoff of 100 ng/mL for the testing of pilots subject to Contract A as indicating a "positive" test result. Delta's aggressive approach is distinguishable from other airlines, which apply an EtG cutoff for positives of 150 or 200 ng/mL.

55. Even under Delta's extremely low cutoff level, each of the fourteen tests returned a negative result for alcohol.

56. Of the nineteen (19) biomarker chemical tests, to which Plaintiff submitted from August 31, 2021, through October 3, 2022, five of the tests measured phosphatidylethanol (PEth) utilizing a blood matrix.

57. PEth is an abnormal phospholipid formed in the presence of alcohol.

58. Due to the acute sensitivity of the PEth testing process, it requires many weeks to a couple of months to replace the blood cells carrying PEth.

59. The final PEth test reported to Dr. Kozarsky was based on a blood specimen, collected October 3, 2022, and reported as negative on October 14, 2022.

60. On October 4, 2022, Plaintiff reported to Defendant Kozarsky that he may have accidentally consumed a low alcohol beer despite his intention to purchase an alcohol free beer.

61. On October 14, 2022, Defendant Kozarsky reported to FAA medical representatives Dr. Charles Chesanow and Dr. Matthew Dumstorf that the Plaintiff was experiencing an "imperfect recovery" and presented an "increased risk for full relapse…."

62. Based on Defendant Kozarsky's report, on October 17, 2022, Dr. Dumstorf advised that the Plaintiff's Special Issuance would be revoked "ASAP."

63. Defendant Kozarsky's October 14 report to the FAA was based on an October 4 evaluation of Plaintiff, which Kozarsky performed as Plaintiff's Medical Sponsor and physician.

64. Dr. Kozarsky's October 14 report indicated that his finding of a relapse was based on three considerations: (1) that Plaintiff had three "dilute" urine specimens in the prior year, (2) that the result of Plaintiff's October 3 PEth test was "sub threshold," and (3) the motivation to purchase beer-like beverages, "whether alcohol containing or not" is "suggestive of an imperfect recovery."

65. Dr. Kozarsky reported the three test results as "dilute," notwithstanding the fact that the laboratory had reported the result of each specimen as "negative-dilute," thereby confirming that the tests confirmed the lack of alcohol in the Plaintiff's system.

66. Dr. Kozarsky's communication to the FAA that Plaintiff's "three recent dilute urine specimens is suggestive of an imperfect recovery" was either an intentional or grossly negligent misinterpretation of the medical data in his possession.

67. Dr. Kozarsky's communication to the FAA was intended to convey, and did convey, that the three "dilute" test results substantiated that Plaintiff had tampered with his specimens in order to avoid detection of renewed alcohol consumption.

68. The "dilute" results that Dr. Kozarsky identified as supporting a determination of relapse specimens reported creatinine levels of 8.6, 17.9, and 11.6 mg/dL and were reported by the laboratory on February 1, 2022, February 19, 2022, and September 27, 2022, respectively.

69. Defendant Kozarsky did not have sufficient training or professional knowledge to interpret the significance of the creatinine measurements for these three tests.

70. Defendant Kozarsky did not seek any professional assistance in the interpretation of the creatinine measurements for these three tests.

71. Defendant Kozarsky took no contemporaneous action upon receipt of the results of the three "dilute" tests to follow up with additional testing.

72. Defendant Kozarsky engaged in no consultation with Plaintiff with respect to the three "dilute" tests.

73. Defendant Kozarsky did not initiate any communication with the FAA upon receipt of the three "dilute" tests.

74. Defendant Kozarsky was advised by Choice Lab, Inc. Director of Operations Michele Gable, who managed the scheduling of Plaintiff's testing, that the protocol for following up on a dilute EtG test was to administer a PEth test to the individual.

75. All of the Plaintiff's PEth tests were negative.

76. Under the specimen validity protocols established by the United States Department of Transportation under 49 CFR Part 40, a "dilute" laboratory result only establishes dispositive

evidence of donor tampering where the resulting creatinine reading is below 2 mg/dL.  49
CFR § 40.197.

77. If the creatinine level is between 2 mg/dL and 5 mg/dL, the employer resolves the dilution
question by scheduling another specimen collection under direct observation.  *Id*.

78. If the creatinine level is greater than 5 mg/dL, but less than 20 mg/dL, the employer has the
**option** of scheduling another specimen collection not under direct observation **or** simply
accepting the test as a negative for drugs.  *Id.*

79. The United States Department of Transportation treats a negative dilute test result as a
negative test for DOT program purposes.

80. To the extent that Dr. Kozarsky had any concern that the three "dilute" specimens reflected
donor tampering, he would have been negligent as a HIMS AME and physician in failing to
proceed with direct observation collections that would have cleared the Plaintiff of any
misconduct.

81. The creatinine levels for the three "dilute" test results evidenced nothing beyond appropriate
hydration practices and that the Plaintiff had abstained from the consumption of alcohol.

82. **Defendant Kozarsky should have communicated to the FAA that** the result of the
hypersensitive October 3 PEth test result was a "negative."

83. Defendant Kozarsky should have communicated to the FAA that the October 3 PEth result
provides strong evidence establishing that the Plaintiff had maintained his commitment to
complete abstention from alcohol consumption.

84. Nevertheless, the paragraph in which Dr. Kozarsky references the PEth result reads as
follows:

> Looking back at the airman's random testing, he has had three dilute specimens this year. See attached. The October 3rd PETH [sic] test result, reported on October 14th, was **sub threshold.**

85. Defendant Kozarsky's reference to the October 3 PEth test result as "sub threshold" was either a willful misrepresentation or a grossly negligent misinterpretation of the test result in a manner intended to support a specious finding of relapse.

86. The third and final basis for the relapse diagnosis that Dr. Kozarsky communicated to the FAA was that "whether or not alcohol consumption occurred, it is an early teaching in formal recovery that 'look alike' beverages, alcohol containing or not, were contraindicated for those in recovery program."

87. Defendant Kozarsky never engaged in any effort to determine whether there was any alcohol content in the "look alike" beverages consumed by Plaintiff.

88. Neither Dr. Kozarsky nor the Talbott program ever advised the Plaintiff that he should abstain from non-alcoholic "look alike" beverages or that the consumption of such beverages could potentially lead to relapse.

89. Dr. Kozarsky never communicated to Plaintiff that the consequence of consuming a non-alcoholic "look alike" beer would be that his Special Issuance first class medical certificate would be subject to revocation or that he would be required to submit to a 98-day inpatient program as part of a treatment of relapse or potential relapse.

90. Defendant Kozarsky's negligent communication of false and misleading information to the FAA led directly to the revocation of Plaintiff's Special Issuance of a first class airman medical.

91. Defendant Kozarsky's negligent communication of false and misleading information to the FAA led directly to the loss of Plaintiff's position as a line pilot with Delta or any other commercial airlines.

92. Defendant Kozarsky had full knowledge of the consequential damage to Plaintiff's career that would arise from his October 7 report to the FAA.

93. Defendant Kozarsky's negligent communication of false and misleading information to the FAA and/or the Delta HIMS program led directly to Plaintiff receiving an ultimatum from Delta that he would have to accept Kozarsky's false diagnosis of alcohol relapse and submit to a minimum ninety-eight (98) day internment in an in-patient program, in order to regain his position as a Delta line pilot.

94. Plaintiff has abstained from alcohol consumption since January 10, 2021.

95. Plaintiff has had over fifty-three random toxicological tests with no positive result of any kind, during the period of March 24, 2021, through the present date evidencing his alcohol abstinence, the lack of dependency, and full recovery, and continues to be subject to ongoing abstinence testing as a condition of his active duty with the USAF.

96. Due to Plaintiff's loss of status as an active line pilot with Delta, he elected to return to active service with the USAF.

97. On December 20, 2022, Surgeon Christopher T. Anderson cleared Plaintiff for flight duties with the USAF.  Since that time, Plaintiff has been actively deployed as a USAF pilot flying U.S. military aircraft, which deployments require prior and ongoing confirmation that he is alcohol and drug free.

98. On August 2, 2022, Psychiatrist Steven M. Lynn. M.D., as part of a report clearing the
Plaintiff for flight duty found "from a psychiatric and addiction medicine perspective, there is
no contradiction for Airman Barnard to continue to fly.

## COUNT ONE

## DEFENDANT'S NEGLIGENT CONDUCT

99. Plaintiff reincorporates paragraphs 1 through 97 as if stated herein.

100.    Defendant Kozarsky, as Plaintiff's physician and Medical Sponsor, had a duty to comply
with the applicable standard of care, including the exercise of the requisite degree of skill and
care in his treatment of the Plaintiff.

101.    Defendant Kozarsky materially deviated from and breached the standard of care, and
failed to exercise the requisite degree of skill and care, in evaluating Plaintiff and negligently
or maliciously rendered a false diagnosis, which he communicated to the FAA, that Plaintiff
had experienced an "imperfect recovery" and presented an "increased risk for full relapse…."

102.    Defendant Kozarsky failed to use a reasonable degree of skill and care with respect to the
performance of his duties as Defendant's physician and Medical Sponsor, including, but not
limited to, his evaluation of the EtG test results, his evaluation of the PEth test results, and
his analysis of the significance of Plaintiff's consumption of non-alcoholic beverages.

103.    The standard of care required Defendant Kozarsky to properly evaluate the EtG and PEth
test results.

104.    To the extent that the proper analysis of EtG and PEth results exceeded his competency,
Dr. Kozarsky had the obligation to seek the assistance of experts in the field of medical
toxicology to properly interpret these results.

105.    Defendant Kozarsky's misrepresentation of the EtG and PEth tests results as supporting a finding of relapse, alcohol consumption, and/or tampering with the Plaintiff's specimen constituted a material deviation from the standard of care that he owed the Plaintiff.

106.    Defendant's material deviations from the standard of care applicable to his role as Plaintiff's physician and Medical Sponsor, caused the Plaintiff's loss of his Special Issuance first class medical certificate and the loss of his line pilot position with Delta.

107.    Defendant's breach directly and proximately caused Plaintiffs to suffer damages, including the loss of wages and benefits in an amount that currently exceeds $575,000 and continues to accumulate with the passage of time.

108.    Plaintiff's injuries, caused by Defendant Kozarsky's material deviations from and breaches of the standard of care, were reasonably foreseeable and were, in fact, intended by the Defendant insofar as Defendant sought the revocation of Plaintiff's Special Issuance.

109.    As a consequence of the negligent acts and omissions giving rise to this count, Plaintiff suffered pecuniary and emotional injuries and is entitled to recover compensatory damages therefor.

110.    Defendant's conduct described herein showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

111.    Accordingly, Plaintiff is entitled to punitive damages under O.C.G.A. § 51-12-5.1

112.    Defendant's conduct described herein was done in bad faith, has caused the Plaintiffs unnecessary trouble and expense, and demonstrated stubborn litigiousness.

113.    Accordingly, Plaintiffs are entitled to attorneys' fees and costs pursuant to Ga. Code. Ann. § 13-6-11.

114.    George Ellis's affidavit, in support of Plaintiff's complaint, is attached as Exhibit "A."


## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the Court to enter a judgment against Defendant:

(A)    Awarding Plaintiff compensatory and punitive damages in an amount to be determined by the jury;

(B)    Awarding Plaintiff equitable relief in the form of an order directing the Defendant to retract false and misleading statements made to the FAA regarding Plaintiff;

(C)    Make whole relief;

(D)    Awarding Plaintiff all allowable costs of litigation, including reasonable attorneys' fees and costs under all three prongs of O.C.G.A. § 13-6-11;

(E)    Awarding Plaintiff whatever other relief the Court deems just and proper.


115.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial on all questions of fact raised by this Complaint.


Respectfully submitted,

MARTIN BARNARD, Plaintiff,

By his attorneys,

ss: // *Lee Seham*  //

Lee Seham (pro hac vice pending)
NY Bar No. 2194306
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
199 Main Street, Seventh Floor
White Plains, NY 10601
Tel: (914) 997-1346
Email: lseham@ssmplaw.com
Attorney for Plaintiff Martin Barnard

ss: // *Samuel Seham*  //

Samuel Seham (pro hac vice pending)
NY Bar No. 5768080
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
199 Main Street, Seventh Floor

White Plains, NY 10601
Tel: (914) 997-1346
Email: samuel.seham@gmail.com
Attorney for Plaintiff Martin Barnard


LOCAL COUNSEL

*/s/.  Alison L. Currie*
Darren Summerville
Georgia Bar No. 691978
Alison L. Currie
Georgia Bar No. 380782
THE SUMMERVILLE FIRM, LLC
1226 Ponce de Leon Avenue
Atlanta, Georgia 30306
(770) 635.0030
darren@summervillefirm.com
alison@summervillefirm.com
Attorney for Plaintiff Martin Barnard

EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

MARTIN BARNARD,                  )   Case No. XX-XX-XXXX-

                       Plaintiff,       )

        v.                      )

ALAN KOZARSKY,           )

                  Defendant.     )

                              )

## DECLARATION OF GEORGE M. ELLIS

I, George M. Ellis, declare as follows:

1.     I submit this declaration in support of Plaintiff's negligence action against Dr. Alan Kozarsky. I am over the age of eighteen and fully competent to testify as to the matters set forth in this declaration, which are true and accurate based upon my own personal knowledge and the documents provided to me by Plaintiff's counsel.

2.     I have been President and CEO of HealthWest LLC since its inception in 2007. With HealthWest, I have provided drug and alcohol regulatory compliance consulting services to the public and private sectors, including for the Federal Railroad Administration and previously for the U.S. Department of Interior. I also managed forensic toxicology consultation contracts with both the Federal Railroad Administration and the U.S. Department of Defense. I have over 49 years of service in the drug and alcohol abuse field. I have extensive experience in all scientific, technical, and policy areas affecting workplace drug and alcohol programs.

3.    From 2007 to 2014, I was Executive Vice President of Substance Abuse Services and then Executive Vice President for Occupational Health Services for Verifications Inc. (VI), a national employment and background screening services company headquartered in Minneapolis MN. I was responsible for supporting drug and alcohol workplace testing and occupational health services for VI clients, including both Fortune 500 and Fortune 100 companies.

4.    From 2004 to 2007, I was a Senior Policy Advisor with the Office of Drug and Alcohol Policy and Compliance (ODAPC), Office of the Secretary of Transportation, Washington DC. As part of that position, I helped establish policy, procedures, and regulatory guidance which governed the Federally mandated drug and alcohol testing of over 8 million employees working for over 650 thousand regulated employers.

5.    From 1989 to 2003, I was President, CEO, and majority shareholder of Greystone Health Sciences Corporation of La Mesa CA. In 2003, Greystone was acquired by First Advantage Corporation of St. Petersburg FL, where I remained as a Vice President in their Occupational Health Services Group until my appointment to ODAPC. Greystone provided national drug and alcohol testing services in the areas of the medical review of drug and alcohol testing results, forensic toxicology consultation, company and agency substance abuse policies, and compliance support services for employers falling under Federal, State, or company policy testing authority. Greystone clients included both Fortune 50 and Fortune 500 companies and a number of Federal and other public agencies (including the Federal Railroad Administration, the U.S. Department of the Interior, other agencies within the Executive Department, and agencies within the U.S. Department of Defense).

2

6.   For nine years, I was involved in the treatment of over 10,000 drug and alcohol
     dependent Navy, Marine Corps, Coast Guard, Army, and Air Force service members at
     the U.S. Navy's then single worldwide residential treatment facility for drug dependency.
     I left as Director of Treatment of that 210 bed residential facility.

7.   I have been an invited speaker at numerous professional and scientific conferences
     relating to topics in the drug and alcohol field. My writings have been published in a
     variety of settings, including the scientific journal Clinical Pharmacology and
     Therapeutics, a research publication of the Transportation Research Board of the National
     Academy of Sciences, and the proceedings of the California Association of
     Toxicologists. I also have been admitted as an expert witness in various drug and alcohol
     related matters including in a National Transportation Safety Board (NTSB) hearing, a
     number of U.S. Coast Guard administrative hearings involving the licenses and
     documents of drug positive merchant mariners, several U.S. Navy Article 32 hearings, a
     number of collective bargaining agreements, and a U.S. Superior Court case. My
     professional associations include being admitted as an associate member of the Society of
     Forensic Toxicologists (SOFT) since 2012, and being admitted as an associate member of
     the California Association of Toxicologists (CAT) since 1996. I have also been a
     member of the International Society of Emerging Drugs (ISSED) since 2020.

8.   During my career, I have authored materials on the identification of employee drug and
     alcohol signs and symptoms in the transportation workplace. I estimate I have also
     personally trained over 800 Federal safety inspectors, employer supervisory personnel,
     and union representatives on the identification of drug and alcohol impaired safety-

3

sensitive workers falling under Federal Railroad Administration, Federal Motor Carrier
Safety Administration, and Federal Aviation Administration regulations.

9.     I have been asked by the law firm Seham, Seham, Meltz & Petersen to review an email
produced by Dr. Alan Kozarsky relating to HIMS participant Mr. Martin Barnard. The
email is dated October 22, 2022, and was sent to the FAA. As part of my consideration, I
reviewed not only Dr. Kozarsky's email and FAA's response, but also the demand letter
from the Seham law firm and all of Mr. Barnard's alcohol biomarker tests conducted to
date.

10.    Specifically, I have been asked to focus on two of the issues Dr. Kozarsky used to defend
and support his determination that Mr. Barnard now had an "imperfect recovery".

11.    Dr. Kozarsky has been identified to me as a board-certified ophthalmologist who
additionally is a part-time senior Aviation Medical Examiner (AME) medically certifying
pilots for the FAA. He is also a HIMS monitor for Delta Airlines overseeing the
treatment/counseling of persons who have been identified as having potential alcohol or
drug issues after a DUI or other event which disqualifies them from performing FAA-
regulated flying duties. It is unknown what level of direct experience and specific
training Dr. Kozarsky has had in the treatment and recovery of alcohol and drug abusers
or in the testing and interpretation of alcohol and/or drug tests.

12.    I understand the following to be the essential facts in this case.

•   In December 2020, Mr. Barnard was arrested and charged with a DUI. He was first
admitted into an Atlanta, Georgia, inpatient alcohol rehabilitation program from
which he successfully graduated in February 2021. He then entered a Delaware,
Ohio, outpatient treatment program which he successfully completed in June 2021.

4

Following this second program, he continued participating in appropriate aftercare services.

- Mr. Barnard's post-treatment recovery process was managed by Dr. Kozarsky as his HIMS monitor starting in February 2021.

- Mr. Barnard was determined by the FAA to be medically qualified to return to flying duties in September 2021.

- According to Dr. Kozarsky, in an October 4, 2022, face-to-face meeting, Mr. Barnard informed Dr. Kozarsky that due to a language misunderstanding and lack of attention he may have consumed one or more low-alcohol beers while on a layover in Amsterdam, Netherlands, thinking they were zero-alcohol beers. I understand Mr. Barnard disputes this account.

- Following that alleged admission, Dr. Kozarsky sent an email to the FAA on October 14, 2022, describing Mr. Barnard's "imperfect recovery" due to three (3) principal factors.

    1. Mr. Barnard had provided three (3) dilute urine specimens in the past year.

    2. Mr. Barnard's most recent alcohol biomarker test (which helps measure previous alcohol use) was "subthreshold".

    3. Mr. Barnard used bad judgment in purchasing an alcohol look-a-like product (a zero-alcohol beer), which turned out to be a low-alcohol containing product.

- In his email to the FAA, Dr. Kozarsky stated that these factors represented "an increased risk for full relapse", and that "the airman could benefit from further education and treatment". Dr. Kozarsky further stated in his email that in their October 4th meeting, he explained in depth to Mr. Barnard the serious nature of his

judgment failure by attempting to purchase a zero-alcohol beer or any zero-alcohol look-a-like product.

- Based on Dr. Kozarsky's email, the FAA withdrew Mr. Barnard's medical certificate.
- However, from the date of his graduation from treatment in February 2021 to date, Mr. Barnard has never failed an alcohol biomarker test, whether for EtG or PEth.

13. My declaration will focus on two factors in Dr. Kozarsky's email that he apparently intended as affirmation that Mr. Barnard was involved in an "imperfect recovery": (a) Mr. Barnard's provision of a dilute urine specimen somehow had an adverse meaning when it came to Mr. Barnard's sobriety or risk of relapse, and (b) Dr. Kozarsky's confusing use of the term "subthreshold" when describing Mr. Barnard's negative alcohol biomarker test.

14. Having over nine (9) years of experience involved in the treatment of many thousands of military hard-core alcohol and drug abusers, and almost 40 years involved in helping to ensure a drug and alcohol-free transportation workplace, I have no sympathy for individuals who choose to risk both public safety and their fellow workers by their use and misuse of impairing substances. I support abstinence during recovery from alcohol or drug dependency, and I am a bit of a hard case when it comes to holding a regulated safety-sensitive transportation worker accountable for an actual relapse during recovery.

15. It is my professional opinion that at best Dr. Kozarsky failed to understand the actual meaning of his supporting reasons for determining Mr. Barnard was an increased risk for relapse. I further believe that Mr. Barnard was treated unfairly based on the inescapable negative inferences found in the plain language of Dr. Kozarsky's email to the FAA which resulted in Mr. Barnard's certificate being withdrawn.

6

What is the meaning of a negative urine drug test that is also dilute?

16.     It appears from Dr. Kozarsky's October 2022 email to the FAA that he is implying Mr.
        Barnard's three (3) dilute urine specimens are to be given a negative or adverse
        connotation when it comes to the risk of relapse.  However, since a dilute urine specimen
        can innocently occur from a variety of acceptable medical reasons (such as the person's
        normal physiology, medical conditions, medications they are taking, and level of
        hydration), from a scientific or medical standpoint a dilute urine test cannot automatically
        be considered as adverse evidence of anything.

17.     The standard definition for a dilute urine specimen in drug and alcohol testing has
        traditionally come from Federal drug testing regulations, both from the U.S. Department
        of Health and Human Services (HHS, for the testing of Federal employees) and the U.S.
        Department of Transportation (DOT, for the testing of Federally-regulated transportation
        workers).

18.     The definition of a dilute urine specimen first appeared in the DOT 49 CFR part 40 Final
        Rule published in December 2000 as part of the government's increased interest in
        specimen validity.  This revised regulation became effective August 1, 2001.  In that
        regulation, §40.3 defines a dilute specimen as "A specimen with creatinine and specific
        gravity values that are lower than expected for human urine"[1].  That still remains the
        current definition under DOT part 40 regulations.

---

[1] 65 FR 79529 (December 19, 2000).   The definition of which urine specimens fall into the dilute category is found
in that same regulation revision at 65 FR 79540. §40.93 identifies that a dilute specimen has a creatinine
concentration of less than 20 and greater than 5 mg/dL with an equally low specific gravity.

19.     Nowhere in any DOT regulation preamble or rule text published before or after the

initiation of specimen validity testing in 2001, does the DOT state or imply that a dilute

specimen is an attempt to circumvent a test or should be treated with an adverse

connotation[2]. In fact, the DOT goes out of its way to state that a negative dilute urine

specimen is an acceptable test result under its safety regulations for regulated employees

(including under the FAA's own modal drug testing regulations)[3]. In other words, under

DOT regulations, a regulated employer is on their own legally if they decide to pursue an

employment-related action or hold an adverse inference based solely on an individual's

negative dilute urine test.


What is the meaning of "subthreshold"?


20.     As commonly defined, the term "subthreshold" describes a stimulus inadequate or too

weak to produce a response[4]. When applied to an alcohol or drug test, the plain language

---

[2] Employers, if they have a policy, are permitted under §40.197 to bring in all negative dilute applicants and/or employees in for a new collection but not under direct observation. Any new collection is to remain private in accordance with standard DOT collection procedures. The employer must accept the results of the second collection even if it is again a negative dilute specimen. Employers are prohibited from targeting individual applicants or employees by directing them to provide a new specimen, but must have a policy to do so for all applicants or employees in at least that entire test category (i.e., all pre-employment tests).

[3] For example, in the preamble for the previously cited December 19, 2000 part 40 rule revision, the DOT states specifically that a dilute specimen does not constitute a refusal to test (65 FR 79480). In a published Q&A interpretation dated September 2001 interpreting §40.197, the DOT states with regard to an employer refusing to hire an applicant after a negative dilute test that "…a negative dilute test is a valid negative test for DOT's purposes…". The DOT further states in that same rule interpretation "Because a negative dilute test result is a negative test for DOT program purposes, the employer is authorized to have the applicant begin performing safety-sensitive functions…".

[4] For example, see "Subthreshold". A definition found in the Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/subthreshold. Accessed 25 June 2024.

meaning of "subthreshold" implies some concentration of alcohol or drug is present but
not enough to meet the cutoff establishing a positive test result.

21.    In the case of monitoring sobriety from alcohol or drugs, the confusing use of
"subthreshold" by Dr. Kozarsky could only have a negative connotation for a reader.  In
Mr. Barnard's case, the implication is that some concentration or presence of alcohol is
there, but not enough to trigger a positive test.

22.    How Dr. Kozarsky knows this to be true is unclear since all of the EtG and PEth tests that
were ever performed on Mr. Barnard from the time of his leaving treatment until now
were reported as negative and not as "subthreshold".

23.    "Subthreshold" is not a term used in the forensic toxicology community or by alcohol and
drug testing laboratories.  When an alcohol biomarker test is reported as negative by a
qualified laboratory, it means negative and nothing else.


How common is alcohol in medications, over-the-counter products, or in foods?


24.    It has been clear for at least the last 30 years that alcohol is present in varying minute
amounts in thousands of products to which a person in alcohol recovery could knowingly
or unknowingly be exposed.  This knowledge is common in both the scientific and
treatment communities.

25.    For example, as a follow-on to the creation of a report I was asked to submit for use by
the U.S. Secretary of Transportation[5], in 1996 I provided the Secretary's office with a

---

[5] By request of the U.S. Department of Transportation Office of the Secretary (DOT OST), I produced and
contributed to the writing of a comprehensive report justifying the use of breath for Federally-required alcohol
testing. Y.H. Caplan and K. M. Dubowsky, "The Use of Breath for Alcohol Testing in the Transportation
Workplace", a report for the U.S. Department of Transportation, 1993.  The report was requested by the Secretary's

listing of about 550 over-the-counter and prescription products known then to contain
alcohol and therefore could potentially be a risk to trigger a Federally-required breath
alcohol test. The products and product forms were from both internally ingested and
externally applied products[6].

26.     In addition, it has been known since the mid-1990s that many commonly available food
and drink products contain minute amounts of alcohol[7]. These include well-known brand
sodas, other so-called alcohol-free drinks, and baked goods.

27.     Even with all the potential for an innocent exposure to alcohol, that is even more reason
why any alcohol biomarker test certified by a qualified laboratory as negative should
only be treated as a negative test and nothing more.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a
witness would testify competently thereto.

Date: July 22, 2024



George M. Ellis

office to help justify to Congress the use of breath in DOT modal administration testing for alcohol. The report was
intended for internal DOT OST use only, but a copy could be made available upon request.

[6] G.M. Ellis, "Ethyl Alcohol-Containing Over-the Counter and Prescription Products – 1995 – a Working List for
the Department of Transportation", 1996. The report was intended for internal DOT OST use only, but a copy could
be made available upon request. The products included elixirs, drops, rinses, lotions, sprays, aerosols, tinctures,
gels, pads, creams, injections, wipes, shampoos, solutions, and capsules.

[7] B.A. Goldberger et al, "Unsuspected Ethanol Ingestion Through Soft Drinks and Flavored Beverages, Letter to the
Editor", Journal of Analytical Toxicology, 20:332-333, 1996. B.K. Logan and S. Distefano, "Ethanol Content of
Various Foods and Soft Drinks and Their Potential for Interference in a Breath-Alcohol Test", Journal of Analytical
Toxicology, 22:181-183, 1998.